# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# AT GREENEVILLE

| | |
|---|---|
| JODI HELBERT, | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| v. | ]  No. 2:14-CV- |
| | ] |
| UHS OF DELAWARE, INC. and | ] |
| KEYTONE CONTINUUM, individually, and | ] |
| d/b/a MOUNTAIN YOUTH ACADEMY, | ] |
| | ] |
| Defendants. | ] |

## COMPLAINT

Plaintiff Jodi Helbert files her complaint for relief against the defendants for their sex discrimination and race discrimination and avers:

1. The Court is empowered to hear the plaintiff's federal employment discrimination/retaliation claims pursuant to its federal question jurisdiction codified at *42 U.S.C. §1331*. The plaintiff's sex discrimination claims and race discrimination claims are premised upon the provisions of Title VII of the 1964 Civil Rights Act, as amended, and as codified at *42 U.S.C. §2000e-2, §2000e-3,* and *§2000e-5*.

2. Plaintiff Jodi Helbert is a multiracial female 47-years-of-age. She

resides in Washington County, Virginia. Ms. Helbert has a B.S. Degree in Social Work and a Master's Degree in Social Work. At the times pertinent to her Title VII claims of sex discrimination and race discrimination, she was employed as a Therapist at the Mountain Youth Academy's adolescent residential treatment facility in Mountain City, Johnson County, Tennessee.

3. Mountain Youth Academy (MYA) is a trauma-based residential treatment facility that provides mental health and educational services to at-risk youth and their families. MYA treats children and adolescents, both male and female, ages 6-17. MYA is owned by Universal Health Services, Inc. (UHS) and operated and managed by UHS of Delaware, Inc. Universal Health Service, Inc. claims on its internet websites that UHS of Delaware, Inc., is its wholly-owned management company. UHS of Delaware, Inc. in turn, operates MYA through the limited liability company of Keystone Continuum, LLC (KC). UHS of Delaware, Inc. is headquartered at 367 S. Gulph Road, King of Prussia, Pennsylvania 19406-3121. Keystone Continuum, LLC has its principal office at 3401 West End Ave., Suite 400, Nashville, TN 37203-6487.

4. According to Universal Health Services, Inc.'s website representations, the defendant UHS of Delaware, Inc. operates approximately 225 residential treatment facilities under different business names throughout the United States and abroad. UHS of Delaware, Inc., and Keystone Continuum jointly

manage and control residential treatment centers including their Mountain Youth Academy in Mountain City, Tennessee. As part of its employment operational control of all of the Universal Health Care Centers which UHS of Delaware, Inc. manages, it and its business partners transfer administrators between their various separate treatment facilities. The two defendants employ thousands of individuals.

5. Both UHS of Delaware, Inc., and Keystone Continuum, LLC, were the plaintiff's employers at Mountain Youth Academy for purposes of Title VII liability. Universal Health Service, Inc.'s registered agent for service of process is listed as C T Corporation System, Suite 2021, 800 Gay Street, Knoxville, TN 37929-9710. UHS of Delaware, Inc., is being served by certified return receipt requested mail on UHS's registered agent and by certified mail restricted to the addressee to the UHS of Delaware, Inc.'s CEO Allen B. Miller at the company's King of Prussia, Pennsylvania address. Keystone Continuum, LLC's registered agent for service of process is also listed as C T Corporation System in Knoxville, Tennessee.

6. Defendant UHS of Delaware, Inc. sent Ms. Helbert electronic notice that it had deposited her bi-weekly paycheck while she was employed at MYA, installed the operational policies and employee handbook personnel policies which determined the plaintiff's working conditions and employment situation, and gave Ms. Helbert and other employees at MYA an "@uhsinc.com" e-mail address.

3

UHS of Delaware, Inc., had notice of Ms. Helbert's EEOC discrimination charges because its Office of General Counsel representative forwarded UHS's Position Statement to the EEOC on or about October 1, 2013 and demanded that Universal Health Services, Inc.'s name be removed from Ms. Helbert's charges.

7. Ms. Helbert applied for a "therapist" position at one of Universal Health Services facilities located in Marion, Virginia, in February 2011. No position was open. UHS referred the plaintiff to its "sister" facility, the Mountain Youth Academy in Mountain City, Tennessee, where a therapist position was available. Because the drive from her home to the MYA in Johnson County was approximately two hours, Ms. Helbert had to rent an apartment in Mountain City so she could accept the position.

8. Though the plaintiff was relatively inexperienced as a therapist, the defendant's managers assigned extremely difficult adolescents to her for treatment. One of Ms. Helbert's patients was a severely-troubled fifteen (15) year-old-male. Malicious comments which the adolescent made to Ms. Helbert over a period of months caused her to express safety concerns to her supervisors and to the Director of Clinical Services (DCS) Teresa Crotty. Ms. Helbert also learned that the adolescent was spreading false rumors that he was having sex with her. She reported these volatile and "boundary issue" remarks to DCS Crotty and asked that the adolescent be transferred to another therapist.

9. Ms. Helbert requested that the troubled adolescent be assigned to a more experienced therapist in May 2011, in December 2011, and in January 2012. DCS Crotty initially agreed to transfer the adolescent but reneged and then repeatedly responded to Ms. Helbert that she would see about it. The adolescent continued to brag to other adolescent patients that he was having sex with Ms. Helbert.

10. In December 2011, Ms. Helbert advised DCS Crotty that she could not continue to deal with the malicious comments and sexual bragging by the adolescent and would have to resign. Crotty begged Ms. Helbert to remain at MYA and brought several other therapists into the office to convince Ms. Helbert to stay. When DCS Crotty agreed to assign the adolescent to another therapist, Ms. Helbert agreed to stay. However, DCS Crotty continued to delay reassigning the troubled adolescent.

11. In late January 2012, while Ms. Helbert was on a scheduled vacation, the adolescent instigated a near riot with several older adolescents at MYA. MYA finally transferred the adolescent to an out-of-state facility in late February 2012.

12. On March 27, 2012, the facility's Director of Human Resources Kathy Smith and fill-in clinical supervisor Samantha Slagle informed Ms. Helbert that a child at another facility had made an allegation against her and that she

would have to turn in her access keys and employee ID. Supervisor Slagle advised Ms. Helbert that the Tennessee Department of Children's Services would be investigating the accusation and that she was being placed on investigative suspension with pay. Neither Supervisor Slagle nor any other administrator furnished the plaintiff with any details about the false accusation. At the time MYA placed Ms. Helbert on investigative suspension, neither Ms. Slagle or any other MYA administrator informed her that the suspension was the result of any performance issues. The HR Manager and Ms. Slagle escorted the plaintiff from the building and told her that she could not return until the investigation into the matter was completed. Ms. Helbert subsequently learned that the defendant's management had instructed her co-workers not to communicate with her until the matter was resolved.

13. In early June 2012, Johnson County Sheriff's Department officer Richard Eller contacted Ms. Helbert regarding her providing a statement pertaining to the false accusation which had been made against her. The plaintiff met with Officer Eller and Tennessee Department of Children's Services Investigator Robert Steuart at the Sheriff's Department in Mountain City on June 6, 2012.

14. At the beginning of the interrogation, the men read Ms. Helbert her Miranda rights. When Ms. Helbert asked what she was being accused of, investigator Steuart and officer Eller advised Ms. Helbert that a young male patient

had accused her of sexually assaulting him in her office. Ms. Helbert told both men that the accusation was false. She described to them the false rumors which the adolescent had been spreading about his having sex with her since May 2011.

15. Steuart did not give Ms. Helbert any additional details about the accusations. He asked Ms. Helbert about her birthmarks. Ms. Helbert did have a flesh colored skin tag high on the inside of her right thigh which was visible beneath shorts in a family photo taken by her daughter and had been left in a stack of photos on her office shelf. During August 2011, a male co-worker visiting with Ms. Helbert was sorting through the photographs. He asked Ms. Helbert about the photo which her daughter had taken. Ms. Helbert explained that her daughter had taken the photo to encourage her to lose weight. Ms. Helbert then placed the photo in her desk drawer. The stack of photos had previously been accessible to any employees and adolescent patients who were in Ms. Helbert's office.

16. On August 9, 2012, HR Manager Smith advised Ms. Helbert by telephone that the company was moving her from a paid suspension to an unpaid suspension. Ms. Smith did not give Ms. Helbert any performance-related reason for MYA changing Ms. Helbert's pay status. Ms. Smith agreed to allow the plaintiff to exhaust her PTO accumulated paid-leave time. Ms. Helbert ceased receiving any income from the Mountain Youth Academy in late August 2012.

17. Ms. Helbert avers that the defendants' administrators and

supervisors were aware at the time they suspended her that the adolescent who had falsely accused her of sexually assaulting him was the same adolescent who had been bragging for months to other patients at MYA that he was having sex with Ms. Helbert and was the same adolescent which DCS Crotty had refused to assign to another therapist despite Ms. Helbert's repeated complaints and requests to do so.

18. MYA administrators and supervisors were also aware that the adolescent's mother had complained to Ms. Helbert about the MYA CEO Paul Kirkham's spending excessive personal time with her son, Kirkham's allowing her son to use his office computer, and Kirkham's taking her son on private outings in his automobile. Ms. Helbert relayed the mother's complaints to DCS Crotty. Crotty responded that the CEO knew his behavior with the adolescent was "problematic."

19. MYA administrators, supervisors, and school teachers also knew that the troubled adolescent had a history of fabricating accusations against adults. Prior to Ms. Helbert's being employed as a therapist at MYA, the adolescent had fallen off his skate board and accused the driver of a passing Coca-Cola truck of hitting him with the truck and leaving the scene.

20. MYA administrators and teachers also knew that the troubled adolescent who had falsely accused Ms. Helbert of sexual assault had earlier

8
Case 2:14-cv-00100-TWP-MCLC   Document 1   Filed 03/29/14   Page 8 of 18   PageID #: 8

claimed that he had sex with a former teacher. The adolescent's mother told Ms. Helbert about her son's earlier false accusations and assured her that the accusations were not true.

21. In spite of their knowledge of the background of the troubled adolescent, of his penchant for making false accusations, and of Ms. Helbert's complaints and repeated requests that MYA assign the adolescent to a more experienced therapist, MYA administrators and supervisors failed and refused to allow her to remain at work because she was a female of mixed race. In contrast and as hereinafter described, MYA administrators and supervisors supported a white male therapist who had been accused of sexually assaulting a male adolescent, assigned the therapists to another section of the facility, and allowed him to remain at work.

22. In September 2012, a staff member at the Tennessee Department of Children's Services advised Ms. Helbert that her file would be referred for an administrative hearing. The plaintiff also learned that Investigator Steuart had never contacted the staff employees on her clinical team whom she had listed as significant individuals who knew about the situation with the now 16-year-old-adolescent and could provide information that his accusation was false.

23. On October 26, 2012, Ms. Helbert received MYA's letter discharging her for allegedly being on investigative leave for more than six

9
Case 2:14-cv-00100-TWP-MCLC   Document 1   Filed 03/29/14   Page 9 of 18   PageID #: 9

months. The plaintiff avers that the stated reason was pretextual. There was no published company policy which required that an employee's exceeding a six-month leave be discharged. The defendants discriminatorily discharged Ms. Helbert even though they had knowledge of the facts and circumstances which demonstrated that the adolescent's accusations were false.

24. Ms. Helbert hired a private attorney in Johnson City, Tennessee to prepare for the Department of Children's Services administrative hearing which was scheduled for January 2013. In November 2012, Ms. Helbert's attorney was finally permitted by MYA to interview the members of her clinical team about the false rumors and the disturbed adolescent's statement. No one at MYA, or at the Department of Children's Services, or the police department had contacted Ms. Helbert's clinical team members as a part of any investigation.

25. Ms. Helbert's attorney informed her two days before her scheduled hearing in January 2013 that the complaining adolescent and his family were refusing to appear at the Department of Children's Services administrative hearing to testify against her.

26. After her termination in late October 2012, Ms. Helbert learned that a white male therapist at MYA had been of accused of sexual assault by a male juvenile patient. Defendants treated the male therapist far better than they had treated Ms. Helbert after she had been falsely accused of sexual assault. At

approximately the same time the defendants were preparing to discharge Ms. Helbert, they simply transferred the accused male therapist to another section of the facility and continued to employ him. The defendants did not suspend the white male therapist, did not bar him from the facility, and did not order staff not to communicate with him while he was being investigated by the Department of Children's Services.

    27. The white male counselor comparator did have to take FMLA leave when he was hospitalized for a ruptured appendix but was returned to work when he recovered. The defendants never took the male comparator's access keys or his employee ID card. MYA administrators conducted an "internal investigation" which concluded that the white male comparator was innocent of the sexual assault charges to justify not suspending him. Those same MYA administrators did not conduct an internal investigation for Ms. Helbert even though they knew that the complaining adolescent had a history of making false accusations, that Ms. Helbert had repeatedly advised them that the troubled adolescent was spreading rumors he was having sex with her, and that Ms. Helbert had been insisting to no avail that DCS Crotty reassign the troubled adolescent to a more experienced therapist.

    28. MYA administrators remained in constant contact with the white male therapist during the state DCS investigation, kept him at work, and even

11

drove him to the Johnson County Sheriff's Department to talk with the Department of Children's Services Investigator because his driver's license had been suspended for multiple DUI conviction. MYA's CEO and Clinical Supervisor served as advocates for the white male therapist with the Department of Children's Services. They made telephone calls to the state agency to complain that investigator Steuart was not being fair to the male therapist and was taking too long to complete the investigation. The sexual assault accusations against the white male therapist were eventually dismissed. The male therapist continued working at the Mountain Youth Academy. Plaintiff Helbert avers that the preferential treatment which MYA afforded the white male therapist during his investigative process is evidence of MYA's gender and race discrimination against her.

29. In an effort to deflect liability for their Title VII discrimination, the defendants claimed to the EEOC that MYA supervisors had counseled Ms. Helbert prior to the DCS investigation for "unrelated professional boundary issues" concerning other patients. In fact, MYA supervisors counseled every recently hired therapist about "boundary issues" as part of their weekly "supervision meetings" with the therapists. The defendants also claimed that their administrators had intended to place Ms. Helbert on a performance improvement plan but "never got around to it" before they discriminatorily suspended her. The defendants' administrators never told Ms. Helbert that they were considering placing her on a

performance improvement plan. The MYA "performance improvement plan" excuse is pretextual.

30. Ms. Helbert had received an exemplary performance evaluation from Director of Clinical Services Terri Crotty three months before she was suspended. Ms. Crotty stated on Ms. Helbert's December 20, 2011 - evaluation that she exceeded the expectations for her position and had done well adjusting to complex paperwork. Ms. Crotty told Ms. Helbert that she wished she had 10 therapists like her.

31. The MYA's October 24, 2012 discharge letter to Ms. Helbert invited her to reapply for any position for which she was qualified in the event the DCS investigation cleared her.

32. Although the defendants' managers insisted to the EEOC that they had to discharge Ms. Helbert after they had placed her on leave for six months, they did not provide the EEOC with any published policy which required that she be discharged. The plaintiff avers that all of the accusations regarding the plaintiff's job performance are pretextual and have been generated to camouflage the defendant's Title VII discrimination.

33. After Ms. Helbert filed her EEOC sex and race discrimination charges against MYA, the defendants advised the EEOC that Ms. Helbert's "boundary issues" had been a factor in their decision to suspend and then discharge

her.  MYA also advised the EEOC that white male staff comparators had no "boundary issues."  Both statements are false.  On several occasions, CEO Paul Kirkham personally, and by himself, took a male adolescent off-campus in direct violation of MYA written policies.  Kirkham also allowed young male patients to use his office computer, took them on drives in his automobile, and assigned them projects which allowed him to spend extensive one-on-one time with each of them.  Kirkham's "boundary issues" with the young boys reached the point that one of the boy's family objected to the amount of time which Kirkham personally spent with their son.  Kirkham was not a therapist and his inappropriate private acts of attention to the adolescent were not within the scope of his administrative duties.  The plaintiff avers that CEO Kirkham's behavior constituted egregious violations of "professional boundaries" and was condoned by the defendants because Kirkham is a white male.  The defendants were aware of, and condoned, other white male employees' violations of "professional boundaries."

34.  Even though it had been allowing male CEO Kirkham to regularly violate its "boundary" policies, MYA advanced spurious post-discharge claims of "boundary issues" against Ms. Helbert to attack her competency as a therapist and to provide an "after-the-fact" justification for its discriminatory decision to suspend her, to cease paying her, and to then discharge her.  The plaintiff avers that the defendants' articulating different and additional reasons at different times for its

14

adverse employment actions against Ms. Helbert is additional circumstantial evidence of pretext and of sex and race discrimination.

35. Plaintiff Helbert avers that the defendants' maintained and encouraged a "culture" of employment preference and bias in favor of male employees. The defendants protected male employees who openly violated their employment policies while punishing female employees whom they accused of violating the same policies. In addition to the circumstances of gender bias described above, the defendants protected male sexual harassers on the MYA staff. When Ms. Helbert complained to her supervisor Samantha Slagle in February 2012 that the MYA Director of Operations had tried to kiss her when she returned from her vacation and had slid his hand inside of her slacks and down her buttocks, Ms. Slagle responded that administrators knew the Director of Operations was "like that" and had sex in his MYA office. Upon being told of the sexual harassment, DCS Crotty advised Ms. Helbert that she did not doubt the sexual harassment had occurred. However, the MYA administrators did not make any effort to formally investigate the sexual harassment or discipline the Director of Operations.

36. In an effort to get along with the MYA administration, Ms. Helbert did not press the matter. MYA suspended Ms. Helbert a month later and then discharged her. MYA now says that Ms. Helbert is the person who had "professional boundary" issues. The male sexual harasser was subsequently

transferred by the defendants to one of their Nashville, Tennessee facilities where he was installed as the CEO.

37. Shortly after Ms. Helbert had complained about the Director of Operations' sexual harassment, CEO Paul Kirkham called Ms. Helbert into his office and criticized her for eating supper at the facility with three adolescent patients who had requested that she eat with them. Kirkham also accused Ms. Helbert of conducting unauthorized therapy with the adolescents because she ate supper with them. Within the month, MYA suspended Ms. Helbert.

38. Plaintiff Helbert avers that she has been discriminated against because of her gender/sex and because of her being of Mixed race in violation of the provisions of Title VII of the 1964 Civil Rights Act, as amended. The defendants discharged Ms. Helbert before the Department of Children's Services had made a final determination on the false charges against her while they retained the accused white male therapist in their employ throughout the state agency's investigation into the accusations against him.

39. As a result of the defendants' gender and race discrimination, Ms. Helbert lost wages and benefits and had to move back to Honaker, Virginia. She was embarrassed and humiliated because of the defendant's discriminatory mistreatment. Ms. Helbert suffered mental distress and anxiety during her discriminatory suspension and has continued to suffer mentally after her

discriminatory discharge. She has had to seek medical treatment for the mental distress the defendant's discrimination has caused her.

40. As a result of the defendants' sex discrimination and race discrimination, Ms. Helbert's enjoyment of life has been diminished and her earning capacity has been impaired. She has lost wages and may lose wages in the future. Ms. Helbert avers that she is entitled to recover back pay, lost benefits, and front pay from each of the defendants.

41. Ms. Helbert avers that the defendants' sex discrimination and race discrimination was intentional, malicious, willful, and in reckless disregard of her federally protected rights. She is entitled to an award of compensatory damages from each defendant and to an award of punitive damages from each defendant.

42. Ms. Helbert has filed her sex and race discrimination charges with the EEOC and has received her right-to-sue letter. She has exhausted her administrative remedies.

WHEREFORE, THE PLAINTIFF DEMANDS:

1. Judgment against the defendants for all compensatory damages to which the plaintiff is entitled under Title VII and *42 U.S.C. §1981a*.

2. Judgment against the defendants for all punitive damages to which the plaintiff is entitled under Title VII and *42 U.S.C. §1981a*.

3. An award of lost wages and lost benefits.

4. An award of front pay.

5. A jury to try the plaintiff's claims.

6. An award of attorney's fees as the prevailing party.

7. Such other relief to which the plaintiff may be entitled.

           s/ C. R. DeVault, Jr.
           CHARLTON R. DEVAULT, JR.
           TN BPR #000428
           102 Broad Street
           Kingsport, Tennessee
           (423) 246-3601

           ATTORNEY FOR THE PLAINTIFF

18
Case 2:14-cv-00100-TWP-MCLC   Document 1   Filed 03/29/14   Page 18 of 18   PageID #: 18